

**null / ALL**
**Transmittal Number: 28219349**
**Date Processed: 12/22/2023**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Julie Heine<br>Seyfarth Shaw LLP - Equifax<br>1075 Peachtree St NE<br>Ste 2500<br>Atlanta, GA 30309-3958 |
| **Electronic copy provided to:** | Beth Hope<br>Lisa Gonzalez<br>Kristin Zielmanski<br>Jessica Spurlock<br>Legal Department<br>Marteese White<br>Nadia Reynaga-Moreno<br>Eric Block<br>Janise Jordan<br>D'Khorvillyn Tyus<br>Deborah Fataki<br>Mackenzie Cole<br>Laura Ratliff<br>Adrienne Adams<br>Trent McNeill<br>Luke Donohue<br>Jennifer Fease<br>Dee Davis<br>Elisa Lyons |

| | |
|---|---|
| **Entity:** | Equifax Information Services LLC<br>Entity ID Number  0635578 |
| **Entity Served:** | Equifax Information Services, LLC |
| **Title of Action:** | Adam Armstrong vs. Equifax Information Services LLC |
| **Matter Name/ID:** | Adam Armstrong vs. Equifax Information Services LLC (15020955) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | Hennepin County District Court, MN |
| **Case/Reference No:** | Not Shown |
| **Jurisdiction Served:** | Minnesota |
| **Date Served on CSC:** | 12/22/2023 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Madgett Law, LLC<br>612-470-6529 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**STATE OF MINNESOTA**                                    **DISTRICT COURT**
**County of Hennepin**            Judicial District:      Fourth
                                  Case Type:              Civil Other/ Misc.

Adam Armstrong,                                    )
                                                   )
                          *Plaintiff,*             )
                                                   )
          v.                                       )
                                                   )
Equifax Information Services LLC,                  )          **SUMMONS**
Experian Information Solutions, Inc.,              )
TransUnion LLC a.k.a. Trans Union LLC,             )
      ,                                            )
                                                   )
                        *Defendants.*              )
                                                   )
                                                   )

    1. **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

    2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this Summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

                3050 Abbott Avenue South, Suite 15
                Minneapolis, MN 55416

    3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

1

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: December 21, 2023          **MADGETT LAW, LLC**

/s/David Madgett
David Madgett (#0390494)
3050 Abbott Avenue South, Suite 15
Minneapolis, MN 55416
612-470-6529
dmadgett@madgettlaw.com
ATTORNEY FOR PLAINTIFF

2

**STATE OF MINNESOTA**                                    **DISTRICT COURT**
**County of Hennepin**          Judicial District:          Fourth
                                           Case Type:             Civil Other/ Misc.

|  |  |  |
|---|---|---|
| Adam Armstrong, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services LLC, | ) | **COMPLAINT** |
| Experian Information Solutions, Inc., | ) | |
| TransUnion LLC a.k.a. Trans Union LLC, | ) | |
| , | ) | |
| | ) | |
| *Defendants.* | ) | |

Plaintiff, by and through his attorney, for his complaint against Defendants upon

personal knowledge as to his own facts and conduct and on information and belief as to all

other matters, states and alleges as follows:[1]

## I.    INTRODUCTION

1. The following case highlights a broken consumer credit reporting and collections

   system that leaves consumers with little to no power beyond litigation to combat

   blatantly false derogatory credit information that cripples them from utilizing the

   credit system.

2. This is not the way the system was designed by the Congress of the United States.

---

[1] Extensive footnotes are provided herein because complaints similar to this are typically removed to Federal Court for the District of Minnesota by the defendant Consumer Reporting Agencies ("CRAs"). Despite the CRAs choosing the federal forum and despite the CRAs representing to both this court and the federal court that jurisdiction exists, CRAs have previously made contradictory pleading and jurisdictional arguments that cases such as these should be dismissed for failure to comply with federal pleading standards, standing issues, or other jurisdictional defects. Accordingly, extensive footnotes are provided to comply with increasingly technical, highly specific, federal pleading standards.

3.  The three major national consumer reporting agencies sued herein dominate American credit reporting and thus determine insurance, banking, and credit qualification and, if approved, the rates paid by consumers, including Plaintiff.

4.  This process is identical for nearly every American.[2]

5.  Additionally, the data collected, manipulated, maintained, and ultimately sold by Defendants is used for background checks for employment, clubs, and housing qualification.

6.  In short, Defendants' data is used in nearly every aspect of the economic system and ultimately determines where individuals can live, work, go to school, travel, and even with whom they may interact.

7.  For these reasons, even a minor error in Defendants' data can be a life altering experience for the average American.

8.  In the present matter, Defendants furnished and published false information about Plaintiff, including, but not limited to, information that Plaintiff missed payments, requested credit inquiries, and applied for credit he did not. This has the obvious result of significantly damaging Plaintiff's credit rating.[3]

---

[2] Notably CRAs maintain a list of judges, regulators, and politicians for whom consumer files and disputes are treated differently than the average American consumer.

[3] The dates accounts were active are used in various national credit scoring models (and proprietary internal lender and insurer models) to determine numerical credit scores. A temporal element is often used with more recent derogatory accounts having a higher impact on scores than older accounts. These scores (used in the plural as there is not any one national scoring model) are in turn used by lenders to determine whether to lend to consumers. Much the same the scores are used to set rates for revolving accounts and to set rates for new and existing insurance products. Here, the effect of the incorrect date of last payment displayed on Plaintiff's consumer report and contained within the consumer's files had the material effect of lowering Plaintiff's credit score. Defendants released Plaintiff's files containing the false information to various scoring agencies, insurers, lenders, and potential lenders, including Plaintiff's current revolving account lenders and current insurers. All of these entities used Plaintiff's consumer files containing the false information to adjust rates and prices and to decide whether to lend to Plaintiff. In all instances, Plaintiff suffered harm by displaying a lower than accurate credit score. This harm to Plaintiff would not have occurred had Defendants simply complied with

9. Given the importance of credit information, The Fair Credit Reporting Act's ("FCRA") accuracy provision demands that Consumer Reporting Agencies ("CRAs") such as Defendant's Equifax, Experian, and TransUnion take actual steps to ensure the maximum possible accuracy of the information they report. Congress and the courts have been resolute: It is not enough for CRAs to simply parrot information they receive from the furnishing entities like the furnishers described herein, particularly where a consumer makes a dispute about information reported.

10. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

11. In the present action, the CRAs failed to fulfil their duties causing substantial harm to Plaintiff including limiting Plaintiff's ability to effectively utilize the credit system and, therefore, effectively participate in American society. The CRAs acted intentionally and foreseeably harmed Plaintiff.

12. Even after Plaintiff overcame the procedural hurdle of disputing this information with the CRAs[4] (in fact paying for the privilege of attempting to correct Defendants' false data -- data that Plaintiff never asked Defendants to collect about him), the

---

their statutory duties, including the duty to fairly and accurately investigate Plaintiff's statement of dispute which Plaintiff took the time effort and expense to prepare. With respect to Plaintiff's dispute ("the Dispute), the document in question provided extensive detail clearly identifying the false information and citing numerous objective inconsistencies between reports necessitating a detailed investigation. Defendants' response was an utter refusal to make any investigation..

[4] The FCRA removed a consumer's ability to take action for defamation under state law. This effectively allows for CRAs to defame individuals with regard to allegations they have not paid debts. The law created procedural hurdles that must be cleared (namely a pre-litigation dispute process) prior to initiating litigation.

5

CRAs' responded that they had, in most cases, confirmed the derogatory information as correct. That was not true.

13. As a direct result of Defendants' actions, Plaintiff's credit scores have been illegally lowered -- making it nearly impossible for Plaintiff to utilize any aspect of the credit system. This has affected Plaintiff's ability to buy a home, rent an apartment, purchase a car, rent a car, obtain better employment, and even get a cellular phone. To say Defendants have meddled in every aspect of Plaintiff's life is an understatement.

14. Finally, while investigating this matter, Plaintiff discovered further bad acts by Defendants Experian and TransUnion.

15. Specifically, Plaintiff discovered the CRAs Experian and TransUnion illegally sold Plaintiff's confidential information to third parties without a permissible purpose. One of those third parties, in turn, offered to sell "background reports" on Plaintiff containing Plaintiff's confidential financial information to anyone willing to buy them. This expressly included people who were unwilling to certify they would not use the information to "stalk or harass" Plaintiff and those unwilling to certify that they would not use Plaintiff's information for identity theft.

16. This is an action for compensation for the illegal release of Plaintiff's information containing both accurate reporting of confidential information and false and defamatory statement about Plaintiff's financial history: Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.

6

## II.   STATEMENT OF JURISDICTION AND VENUE

17. This Court has Jurisdiction over the subject matter of this action pursuant to Minn. Stat. §484.01 and the presumption of concurrent state court jurisdiction.

18. This Court similarly has original subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 1681 et. seq., The Fair Credit Reporting Act ("FCRA"), which permits consumers to file suit in the courts of their respective states.

19. Venue is proper pursuant to Minn. Stat. §542.09 because the cause of action arose within the State of Minnesota and the County of Hennepin.

## III.   PARTIES

20. Plaintiff is an adult resident of the state of Florida and part time resident of Minnesota.

21. Equifax Information Services LLC ("Equifax") is a national consumer reporting agency ("CRA") registered as a Domestic Limited Liability Company in the State of Georgia. It has registered with the Minnesota Secretary of State a service of process address at 2345 Rice Street, Suite 230, Roseville, Minnesota 55113.

22. Trans Union LLC a.k.a. TransUnion, LLC ("TransUnion") is a national consumer reporting agency registered as a Limited Liability Company in the state of Delaware. Trans Union has registered with the Minnesota Secretary of State a service of process address at 2345 Rice Street, Suite 230, Roseville, Minnesota 55113.

23. Experian Information Solutions, Inc. ("Experian") is a national consumer reporting agency registered as a business corporation in the state of Ohio. Experian has

7

registered with the Minnesota Secretary of State a service of process address at CT

Corporation System at 1010 Dale Street North, Saint Paul, Minnesota 55117-5603.

24. Plaintiff is informed and believes, and thereon alleges, that at all times relevant,

Defendants all conducted business in the State of Minnesota and in the County of

Hennepin.

25. Specifically, all Defendants have purposefully availed themselves of the laws of the

State of Minnesota by collecting and publishing data on Minnesota residents and

by furnishing Plaintiff's reports to Minnesota companies including a potential

Minneapolis based landlord of Plaintiff. Defendants have published reports about

Plaintiff both expressly relating to real estate in Minnesota and otherwise foreseeably

used for the purpose of rating Plaintiff's ability to rent property within Hennepin

County, Minnesota.

26. **BACKGROUND ON APPLICABLE STATUTORY LAW AND
APPLICATION TO THE FACTS ALLEGED**

27. Today in the United States there are three major consumer reporting agencies: Equifax,

Experian and Trans Union, hereafter referred to collectively as the "CRAs".

28. As companies who collect, store, and sell the confidential financial information of

nearly every American, these companies are regulated under the FCRA.

29. Specifically, the Defendants Equifax, TransUnion, and Experian are CRAs as defined

by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f) because the companies are in

the business of assembling and analyzing consumer information before selling

consumer reports to third parties.

30. Similarly, Plaintiff is an individual, and, therefore, at all times mentioned herein was a "consumer" as defined by 15 U.S.C. § 1681a(c) and therefore may bring a private cause of action under the act.

31. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of U.S. Senator William Proxmire); *Id.* at 36570 (statement of U.S. Representative Leonor Sullivan); . . . . In enacting FCRA, Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

32. "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke*, 2011 WL 1085874, at *4.

33. Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

9

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

34. Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

35. It has long been the law that a CRA, such as Experian, Equifax, or TransUnion, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the disputed item. *See, e.g., Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT- LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted*, No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the

10

creditor] was not sufficient to determine whether the disputed information was inaccurate.").

36. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

37. As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed. 2000); *see* Webster's Third New Int l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

*Johnson*, 357 F.3d 426, 430 (4th Cir. 2004).

38. Further, as the CRA Defendants are aware, the U.S. District Court for the Eastern District of Virginia has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§ 1681e(b) and § 1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

11

39. It has long been the law – since 1970, in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[5]

40. After receiving notice of a dispute with regard to the completeness or accuracy of any information, a furnisher must conduct a reasonable investigation with respect to the disputed information, and in so doing the furnisher must:

   a. review all relevant information provided by the consumer reporting agency;

   b. report the results of the investigation to the consumer reporting agency;

   c. and, *inter alia*, if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation, the furnisher must modify, or permanently block the reporting of that item of information.

41. Other relevant sections of the FCRA, include Section 604, 15 USC § 1681i(b), which requires CRAs to assure that users have a permissible purpose for the use of consumer reports. The Consumer Financial Protection Bureau has recently emphasized the growing importance of the FCRA's data privacy protections.[6]

---

[5] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.
[6] https://www.govinfo.gov/content/pkg/FR-2022-07-12/pdf/2022-14823.pdf

42. CRAs must also assure that outdated and obsolete information is removed from reports. Section 605 of the FCRA, 15 U.S.C. § 1681c addresses the maximum time that various accounts may be listed on a consumer credit report.

43. Finally, furnishers of information to CRAs must also comply with certain aspects of the Act. Section 623 of the FCRA, 15 U.S.C. § 1681s-2, addresses the duties of persons who furnish information to the CRAs.

## IV.   SPECIFIC FACTUAL ALLEGATIONS

44. **The Defendants Experian, Equifax, and TransUnion were Reporting False Derogatory Information on Plaintiff's Credit Reports.**

45. The CRAs prepared and issued consumer reports concerning Plaintiff that included false and inaccurate information including, *inter alia*:

   a.  False and internally inconsistent statements and information about Plaintiff's obsolete prior debts;

   b.  False statements and information about Plaintiff's payment history;

   c.  False statements that Plaintiff had made numerous applications for credit;

   d.  Similarly, Defendants' appear to have released Plaintiff's personal financial information without Plaintiff's consent.

46. Concrete examples of Defendant's false statements include, but are not limited to, the following:

   a.  All bureaus incorrectly reported that Plaintiff missed a June 2016 American express payment despite American Express itself confirming that Plaintiff missed no such payment.

13

    b. All bureaus reported a hard inquiry from Happy Money Inc., a company with which Plaintiff has never attempted to do business with.

    c. All bureaus reported a hard inquiry from IR/Priority Finance, a company with which Plaintiff has never attempted to do business with.

47. **Plaintiff discovers the information and promptly Disputes the Inaccuracies with the CRAs.**

48. On or about August 9, 2022, the Plaintiff discovered, the false information outlined above.

49. Plaintiff promptly disputed the above-mentioned incorrect information with each of the CRAs.

50. Specifically, Plaintiff sent all Defendants such notices via certified mail on or about August 9, 2022 and on numerous occasions thereafter..

51. Plaintiff is in possession of copies of those letters verified as accurate and unchanged by a third party, and Plaintiff is in possession of certified mail receipts proving the letters were mailed and delivered.

52. Plaintiff received dispute results from two of the CRAs claiming that the improper information was "verified as accurate".

53. Defendants do appear however to have corrected some information, including correcting Plaintiff's name and address and removing one reference to an application for credit that did not occur.

14

54. Despite the plainly false nature of the alleged debts, missed-payments, and obsolete accounts, they -- together with the other aforementioned inconsistencies -- remain on Plaintiff's credit report.

55. Defendants' inaction and refusal to abide by their statutory duties are consistent with the experiences of other consumers attempting to remove false information from their credit reports.

56. As reported in the StarTribune as recently as Monday March 27, 2023, consumer complaints against the bureaus nearly doubled in 2022.[7]

57. As one consumer in the article put it:

> "I've been in constant dispute with the credit bureaus for almost a year now and have yet to get ... the inaccurate accounts on my credit report removed ...I feel like I am being taken advantage of and have been throughout this whole situation. I've been getting ignored for months on top of months and it is leaving me no other choice but to take these matters to court if the issue doesn't get resolved."

58. Much the same, Plaintiff's numerous letters and other attempts to amicably resolve this matter have been totally ignored by Defendants -- necessitating this case and its inevitable removal by Defendants to federal court: Hundreds of nearly identical matters filed by the below signed counsel on behalf of other consumers with nearly identical experiences further support Plaintiff's allegations.

59. **The CRA Defendants Did Not Conduct Any Investigation Here and Do Not Conduct Investigations in Most Consumer Disputes.**

---

[7] Michelle Singletary, Complaints against 3 major credit bureaus nearly double in 2022, STARTRIBUNE (Reposted from WASHINGTON POST) Monday March 27th 2023, Business P.1, available at
https://www.washingtonpost.com/business/2023/03/17/credit-bureaus-consumer-complaints/

01133-Armstrong

60. Unknown to the Plaintiffs until this lawsuit, it has long been the practice of Experian, Equifax and TransUnion to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to third-party outsource vendors located overseas. Equifax and TransUnion use a vendor previously known as Intelenet Global Services and now known as Teleperformance.

61. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its disputes received by postal mail.[8]

62. Both Teleperformance and the Experian affiliate use low-wage employees to work quickly to process consumer dispute letters received, skimming the letters, and selecting one or a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.

63. These dispute agents with Teleperformance and Experian Chile are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

64. The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

---

[8] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiffs will pursue their 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as Plaintiff alleges against Equifax for its farming-out investigations to Teleperformance.

16

65. In fact, Equifax, Experian, and TransUnion strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Experian, or TransUnion. It gets sent to Defendants' creditor customer (such as the furnishers described herein) for its sole review and consideration.

66. Regardless of whether these statements are correct, Equifax, Experian, and Trans Union believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

67. Equifax, Experian, and TransUnion did not conduct any reinvestigation of consumer disputes. Instead, they attempted to circumvent their statutory duties by tasking overseas data vendors with investigating Plaintiff's disputes and those of all other American consumers. Although Defendants will undoubtedly make the argument that they fulfilled their duties by employing outside agents to investigate, these agents did nothing other than pass Plaintiff's dispute along to the furnishers. As such, Defendants failed to failure to fulfill their congressionally mandated duties to investigate subjecting them to the remedy of damages allowed under the FCRA.

68. **Defendants are actively selling Plaintiff's information for an improper purpose.**

69. Defendants' transgressions did not, however, end there: Despite recent emphasis on the importance of protecting consumer information, Defendants Experian and Trans Union have exercised wonton disregard for the law and regulators' concerns, by issuing

17

consumer reports (Plaintiff's included) to individuals and companies without a permissible purpose.

70. Specifically, Defendants Experian and Trans Union are known to have provided protected consumer files to a known cyber extortion website, Mylife.com, which in turn, sold or offered to sell, and currently offers to sell, the same information to any person willing to pay for it; regardless of the fact such users lack a permissible purpose under the statute.

71. In a mob style extortion scheme, Mylife.com, thereafter marketed "data protection" services to Plaintiff whereby Plaintiff's confidential consumer data would be removed from the Mylife.com website if Plaintiff agreed to pay Mylife.com a monthly fee!

72. **Plaintiff Suffered Harm.**

73. Various individuals considering lending to Plaintiff consulted Plaintiff's consumer reports containing the false information at issue.

74. The direct result of the CRAs issuance of consumer reports to potential lenders containing the false information at issue has caused significant damage to the reputation of Plaintiff and to Plaintiff's ability to borrow money, conduct commerce, and function within the modern American society, which by any measure is totally dependent on access to credit.

75. Specifically, the CRAs' false reports have, to date, resulted in Plaintiff paying higher insurance rates.

18

76. The direct result of Defendants' false reporting was significant damage to Plaintiff's credit rating thereby making it impossible for Plaintiff to obtain favorable loans or any reasonably priced credit card.

77. As a further direct consequence of Defendants' illegal conduct, Plaintiff suffered from anger, frustration, anxiety, and humiliation from being unfairly excluded from the benefits of the credit system.

78. Similarly, as a further result of Defendants' systematic failure to fulfill their statutory duties as CRAs and furnishers, Plaintiff suffered personal financial loss and loss of standing in the community.

79. Plaintiff was further harmed by incurring legal and professional fees in consulting with various experts regarding the course of action for correcting the errors and in bringing this suit.

80. **Defendant's Conduct was Willful.**

81. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

82. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiffs and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

19

83. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Experian, Equifax and TransUnion's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

84. Experian, Equifax and TransUnion have received many thousands of disputes and other complaints regarding the creditors at issue in this case -- sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

85. During the last decade, just in federal court alone, the creditor-furnishers disputed by Plaintiff have had to defend hundreds of consumer lawsuits.

86. In many or even most of these FCRA lawsuits brought by consumers, one or more of the CRA Defendants was a named co-defendant.

87. Experian, Equifax and TransUnion knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

88. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

89. Each Defendant regularly receives unredacted consumer dispute details from this database.

20

90. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

91. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

92. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to TransUnion.

93. Further, over 30,000 CFPB complaints against Equifax, Experian and TransUnion were based largely on its failure to reasonably investigate consumer disputes.

94. Further, consumers have submitted thousands of complaints about the creditor-furnishers to the CFPB regarding credit reporting.

95. Just in the last 12 months alone, Equifax, Experian, and TransUnion have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Equifax, Experian, and TransUnion violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

96. While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Experian, Equifax and TransUnion on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

21

97. Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g., Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of Plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

98. Equifax has even been warned by one of its home state District Courts, the Southern District of Georgia (even citing an important decision of this Court), which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

22

> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson*, 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.*, 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F. Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at \*5

(S.D. Ga. Aug. 29, 2005).

99. Defendants have long had specific notice from courts about their expected conduct in dispute investigations. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). The CRA's notice was so substantial that a 4th Circuit Court instructed the jury in a § 1681i(a) trial in which Equifax was a defendant:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed... that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007)

100.    Equifax, Experian, and TransUnion have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

23

101.      In 2015, a large group of state Attorneys General (AG) forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA. The AG's Settlement required amongst many changes and mandates that the Defendants comply with § 1681i(a).[9]

102.      The AG's Settlement also required the CRA Defendants to conduct significant research and data gathering, even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG's Settlement in these regards.

103.      Equifax, Experian, and TransUnion are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019. ("NCLC Report").[10]

104.      The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to

---

[9] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News- Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[10] Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

24

<u>Fix Errors in their Credit Reports,</u> the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian, and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

105.    Among many of the Defendants' accuracy failures, the NCLC Report

discovered:

- **Insufficient Information Conveyed and Considered in Investigation.** Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer.** Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations.** Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers.** Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

25

106.    Despite the Plaintiffs notice and judicial, regulatory, and public interest criticism, Experian, Equifax and TransUnion have refused to change their dispute investigation process because of the expense that would be incurred to do so.

107.    In fact, the Defendants seem to have only become more emboldened in their decision to disregard their statutory duties to investigate consumer disputes.

108.    In 2020, Equifax, Experian, and TransUnion implemented the e-Oscar system -- changing how the CRAs respond to consumer complaints and requests for reinvestigation of information alleged to be incorrect. A recent CFPB analysis reveals that the CRAs are closing these complaints faster and with fewer instances of relief. In 2021, the CRAs offered some form of relief in less than 2% of complaints down from nearly 25% complaints in 2019.[11]

109.    The CRAs treatment of consumers has outraged regulators, politicians on both sides of the aisle, courts, and consumers themselves.

110.    A recent Consumer Reports study described the situation as follows:

"The thousands of consumers who checked their credit reports and filled out our survey provided us with a picture of a credit reporting system that is rife with errors, is difficult to access and navigate, and can trap people into paying for services that they neither want nor need. The consumers who provided us with written responses expressed deep frustration with a system that has an enormous impact on their lives but that they cannot control."[12]

111.    The CFPB describes the situation with TransUnion as follows:

---

[11] Consumer Financial Protection Bureau, Annual report of credit and consumer reporting complaints; An analysis of complaint responses by Equifax, Experian, and TransUnion, Available at: https://files.consumerfinance.gov/f/documents/cfpb_fcra-611-e_report_2023-01.pdf
[12] Consumer Reports, "A broken System: How the Credit Reporting System Fails Consumers and What to Do About It." Available at: https://advocacy.consumerreports.org/wp-content/uploads/2021/06/A-Broken-System-How-the-Credit-Reporting-System-Fails-Consumers-and-What-to-Do-About-It.pdf

"The CFPB expects financial companies to work constructively with us to resolve compliance issues quickly and make appropriate fixes—and companies typically do. But instead, TransUnion continued to repeatedly violate the terms of [prior agreements with the CFPB], as well as other consumer protection laws. Rather than quickly resolve these clear repeat offenses by fully redressing victims and making changes to its business to ensure these violations never recur, TransUnion's conduct has made it crystal clear that the company is an out-of-control repeat offender that must be held accountable. Put simply, TransUnion's leadership is either unwilling or incapable of operating its businesses lawfully."[13]

112.    In summary, Experian, Equifax and TransUnion's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## V.    CLAIMS

### FIRST COUNT
### Willful Noncompliance with the FCRA
### (Against All Parties)

113.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

114.    The CRAs all willfully failed to comply with the requirements of FCRA, including but not limited to:

   a.   Failing to comply with the requirements of Section 604, 15 USC § 1681i(b), by selling consumer information to users without a permissible purpose.

   b.   failing to comply with the requirements of Section 605, 15 USC § 1681c(4), in publishing a report with obsolete information.

---

[13] Director Chopra's Prepared Remarks on the Repeat Offender Lawsuit Against TransUnion and John Danaher, Available at: https://www.consumerfinance.gov/about-us/newsroom/director-chopras-prepared-remarks-on-the-repeat-offender-lawsuit-against-transunion-and-john-danaher/

27

    c. failing to comply with the requirements of Section 607(b), 15 USC § 1681e(b), in assuring consumer reports are prepared with maximum possible accuracy;

    d. failing to comply with the requirements of Section 611, 15 USC § 1681i, in failing to conduct a reinvestigation of the disputed information;

    e. Failing to comply with the requirements of Section 611, 15 USC § 1681i(a)(6), in failing to even attempt to notify Plaintiff of the results of its investigation.

115.    As a result of Defendants' failure to comply with the requirements of FCRA, Plaintiff has suffered, and continues to suffer actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, interference with his normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear, worry, and related health problems, for which Plaintiff seeks damages in an amount to be determined by the jury.

### SECOND COUNT
### Negligent Noncompliance with the FCRA
(Against All Defendants)

116.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

117.    The CRAs negligently failed to comply with the requirements of the FCRA, including but not limited to:

a. Failing to comply with the requirements of Section 604, 15 USC § 1681i(b), by selling consumer information to users without a permissible purpose.

28

a. failing to comply with the requirements of Section 607(b), 15 USC § 1681e(b), to assure consumer reports are prepared with maximum possible accuracy;

b. failing to comply with the requirements of Section 611, 15 USC § 1681i, to conduct a reinvestigation of the disputed information;

c. failing to comply with the requirements of Section 605, 15 USC § 1681c(4), to publish report with only current information.

f. Section 611, 15 USC § 1681i(a)(6), in failing to even attempt to notify Plaintiff of the results of its investigation.

118.    As a result of Defendants' failure to comply with the requirements of FCRA, Plaintiff has suffered, and continues to suffer actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, invasion of privacy, interference with normal and usual activities, emotional distress, anger, frustration, humiliation, anxiety, fear, worry, and related health problems, for which Plaintiff and the class members seek damages in an amount to be determined by a jury.

## VI.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, by and through his    attorney, respectfully prays for judgment to be entered in favor of Plaintiff and against Defendant as follows:

a.    All actual compensatory damages suffered;

29

b.    statutory damages in an amount up to $1,000.00 per violation per plaintiff, pursuant to 15 U.S.C. §1681n;

d.    injunctive relief prohibiting such conduct in the future;

e.    reasonable attorney's fees, litigation expenses, and cost of suit; and

f.    any other relief deemed appropriate by this Honorable Court.

Dated: December 21, 2023              **MADGETT LAW, LLC**

                         /s/David Madgett
                         David Madgett (#0390494)
                         3050 Abbott Avenue South, Suite 15
                         Minneapolis, MN 55416
                         612-470-6529
                         dmadgett@madgettlaw.com
                         ATTORNEY FOR PLAINTIFF

01133-Armstrong